Docket No. 110066.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

CORINNE THOMPSON, Appellee, v. CHRISTIE GORDON *et al.*,
Appellants.

*Opinion filed January 21, 2011.*

JUSTICE THOMAS delivered the judgment of the court, with
opinion.

Chief Justice Kilbride and Justices Freeman, Garman, Karmeier,
Burke, and Theis concurred in the judgment and opinion.

## OPINION

Plaintiff, Corinne Thompson, individually and as administrator of
the estates of her husband, Trevor Thompson, and daughter, Amber
Thompson, sued defendants, Jack E. Leisch and Associates, Inc., and
CH2M Hill, Inc., along with others not parties to this appeal, for
negligence. The circuit court of Lake County granted summary
judgment in favor of defendants. The appellate court reversed the trial
court and remanded for further proceedings. 398 Ill. App. 3d 538.

This court granted defendants' petition for leave to appeal. Ill. S.
Ct. R. 315(a) (eff. Feb. 26, 2010). In addition, pursuant to Illinois
Supreme Court Rule 345 (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)), we
allowed the Illinois Trial Lawyers Association to file a brief *amicus
curiae* on behalf of plaintiff. We also permitted the American Council

of Engineering Companies of Illinois, the Illinois Society of Professional Engineers, the American Institute of Architects–Illinois Council, the Structural Engineers Association of Illinois, and the Illinois Professional Land Surveyors Association, as well as the Illinois Section of the American Society of Civil Engineers and the Association of Licensed Architects, and the Illinois Association of Defense Trial Counsel, to file briefs *amici curiae* on behalf of defendants.

## BACKGROUND

On January 16, 1991, defendants entered into a contract with Western Development Corporation (WDC) to provide engineering services in connection with WDC's development of the Gurnee Mills shopping mall in Gurnee, Illinois.[1] In order to accommodate the anticipated increased traffic as a result of the shopping mall, WDC was required to improve Grand Avenue, also known as State Route 132, as part of the development. Initial studies indicated that the cloverleaf ramp from northbound I-94 to westbound Route 132 did not have sufficient capacity to handle the additional traffic that the mall would generate. Accordingly, WDC's contract with defendants required defendants to design two ramps west of I-94, as well as a replacement bridge deck surface over I-94. The original bridge deck had a concrete median approximately six inches high and four feet wide that divided the eastbound and westbound lanes of traffic. The replacement bridge deck designed by defendants had a median that was approximately seven inches high and four feet wide.

The Illinois State Highway Toll Authority, which owned I-94, and the Illinois Department of Transportation (IDOT), which operated and maintained Grand Avenue on behalf of the State of Illinois, reviewed all plans because IDOT had to approve any change to Grand Avenue. IDOT approved the plans and issued a permit for work to commence.

---

[1]Defendant Jack E. Leisch and Associates entered into the original contract with WDC. During the course of the project, defendant Jack E. Leisch and Associates merged with defendant CH2M Hill, Inc. The final contract, the contract at issue in this case, is between WDC and CH2M Hill, Inc., following its merger with Jack E. Leisch and Associates.

The work was completed sometime in 1991 or 1992.

Thereafter, on November 27, 1998, Trevor Thompson was driving westbound on Route 132/Grand Avenue, with plaintiff and Amber Thompson as passengers. Christie Gordon was driving eastbound on Route 132/Grand Avenue when she swerved to avoid another vehicle. Gordon lost control of her vehicle and hit the median separating the eastbound and westbound traffic. Gordon's vehicle then vaulted into the air and landed on top of the Thompson's vehicle, killing Trevor and Amber Thompson, and seriously injuring plaintiff.

The gravamen of plaintiff's case against defendants is that defendants should have designed and constructed a "Jersey barrier," on the road, including the bridge deck and the areas encompassing the interchange and weave lanes. Plaintiff asserts that had a Jersey barrier been constructed, Gordon's vehicle would not have vaulted into the air and onto the Thompson's vehicle when she lost control and struck the median.

Specifically, in her ninth amended complaint, plaintiff alleged, *inter alia*, that defendants were negligent in that they: failed to provide a median barrier warrant analysis in their design proposal for improvements to the Grand Avenue–I-94 interchange; failed to consider the necessity of crossover protection on the bridge deck, including a Jersey barrier; failed to design a barrier median to separate roadway traffic at the Grand Avenue–I-94 interchange; and failed to consider any traffic impact studies when designing the interchange improvements.

Defendants filed a motion for summary judgment. Defendants argued that they owed no duty to plaintiff because the work that they contracted to perform for WDC did not require median barrier analysis or design, and the design work performed by defendants did not encompass the area of the accident.

In response, plaintiff filed the affidavit of Andrew Ramisch, her Illinois Supreme Court Rule 213 (Ill. S. Ct. R. 213 (eff. July 1, 2002)) expert witness.[2] Ramisch testified in his affidavit that defendants failed to meet the ordinary standard of care. Specifically, Ramisch opined

---

[2]Ramisch's qualifications as an expert witness were addressed in a prior decision from this court. *Thompson v. Gordon*, 221 Ill. 2d 414 (2006).

that: defendants failed to properly consider and analyze all available data provided by their consultants; failed to consider crossover protection and failed to perform an analysis of crossover protection on the bridge deck; failed to submit to WDC and IDOT for consideration the necessity of crossover protection in the form of a Jersey barrier on the bridge deck at the interchange; and failed to design a Jersey barrier over the bridge of the Grand Avenue interchange. Ramisch testified that crossover accidents were likely to occur, and that the purpose of a Jersey barrier is to prevent vehicles from crossing over the barrier into oncoming lanes of traffic. Had defendants performed the engineering work within the standard of care, it is more probable than not that a Jersey barrier would have been designed and constructed which would have prevented Christie Gordon's vehicle from crossing into the westbound lanes of Grand Avenue and colliding with the Thompson's vehicle.

The trial court granted defendants' motion for summary judgment. The trial court stated that defendants' duty to plaintiff was circumscribed by the terms of the contract that they entered into with WDC and the scope of their work was determined by their contractual undertaking. The trial court observed that the contract did not call for an assessment of the sufficiency of the median barrier specifically. Rather, the contract simply required defendants to reconstruct the raised median and road surface. The trial court concluded that to impose an obligation on defendants to perform a median analysis, as if the contract called for a redesign of the roadway or a raised median, would impose an obligation on defendants that was not specified in their contract.

In so holding, the trial court relied on this court's decision in *Ferentchak v. Village of Frankfort*, 105 Ill. 2d 474 (1985). In *Ferentchak*, the court held that a civil engineer was not required to establish minimum foundation grade levels "absent a specific contractual commitment." *Id.* at 482-83. Based upon *Ferentchak*, the trial court found that there was no agreement in which defendants undertook the duties and obligations which Ramisch testified were breached by defendants.

The appellate court, with one justice dissenting, reversed the trial court and remanded for further proceedings. 398 Ill. App. 3d 538. The appellate court subsequently denied defendants' petition for rehearing,

but issued a supplemental opinion upon denial of rehearing.

In the appellate court, plaintiff argued that, pursuant to the contract, defendants had a duty to consider and then design an improved median barrier. Defendants responded that the plain language of the contract, which required them to submit design plans for a bridge deck "replacement," indicated that defendants' role was limited to submitting designs to recreate the bridge deck exactly as it had existed, rather than submitting designs for an improved or altered bridge deck.

The appellate court noted that, looking at the word in isolation, there was authority in case law and in dictionary definitions to both support and contradict defendants' definition of the word "replacement." *Id.* at 543. However, the appellate court further noted that, viewing the contract as a whole, the contract provided additional context to clarify the use of the word "replacement." *Id.* In the "Scope of Services" section of the contract, in the paragraph immediately preceding the bridge deck replacement paragraph, the contract provided that defendants would prepare plans for "interchange improvements" or "roadway improvements" to an area near the bridge. The appellate court held that the contrast between the contract's use of the word "improvements" in one section and "replacement" in the following section supported defendants' interpretation of the word "replacement" as contemplating that defendants would submit plans to rebuild the bridge deck and median exactly as it already existed. *Id.* at 543-44.

The appellate court, however, then found that the standard of care clause in the contract added an important qualifier to defendants' work: that defendants were obligated to act within the prescribed standard of care. *Id.* at 544. Therefore, defendants labored under a duty to submit plans to replace the bridge deck as it existed prior to defendants' construction project, but also owed a duty to perform that contractual task using the degree of skill and diligence normally employed by professional engineers. *Id.*

Having determined the duty the contract imposed on defendants, the appellate court next addressed whether plaintiff had presented any evidence to support her claim that defendants breached their duty. *Id.* The court held that plaintiff had presented such evidence in the form of Ramisch's affidavit. *Id.* Ramisch's affidavit stated that an engineer

acting within the standard of care while creating plans to replace the bridge deck would have considered and designed an improved median barrier. *Id.*

The appellate court rejected defendants' claim that, pursuant to *Ferentchak*, their duties were confined to those explicitly mentioned in the contract. The appellate court distinguished *Ferentchak*, holding that the essence of the holding in *Ferentchak* was that the engineer in that case had no duty because he had no knowledge about the defective design at issue and no involvement in creating it. *Id.* at 548. In this case, the court held, defendants had both knowledge of the defective design at issue and involvement in creating it. *Id.*

In its supplemental opinion on denial of rehearing, the appellate court clarified that its holding was that there was at least a question of fact whether defendants owed a duty to consider an improved median barrier. *Id.* at 558. By virtue of Ramisch's affidavit, plaintiff had raised a question of fact as to whether the professional standard of care included such a duty. *Id.* The appellate court stated that the measure of skill and care employed by a professional engineer is a question of fact. *Id.*

Although the dissenting justice agreed with the majority that defendants' contractual obligation only obligated defendants to replace the bridge deck, she disagreed with the majority's interpretation of the standard of care clause in the contract as imposing a duty to redesign the bridge deck and median to include a Jersey barrier. *Id.* at 551-52 (Hutchinson, J., dissenting). The dissent stated that the plain language of the standard of care provision expressly limited the standard of care to defendants' services, meaning the work that defendants were contractually obligated to perform. *Id.* at 552. Defendants were contractually obligated to rebuild the bridge deck and median as they then existed. *Id.* They were not required to redesign the bridge deck to include a Jersey barrier. *Id.* The dissent also disagreed with the majority's attempt to distinguish *Ferentchak*. The dissent stated that by focusing on the "essence" of the *Ferentchak* decision, the majority overlooked the actual holding in the case, which was that an engineer's duty is dependent only on his contractual obligations. *Id.* at 554.

-6-

ANALYSIS

On appeal, defendants argue that their contract did not impose a duty to recommend or design a Jersey barrier; therefore, the appellate court erred in reversing the trial court's order granting their motion for summary judgment. When an appeal arises from the reversal of a trial court's order granting summary judgment, this court's review is *de novo. Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

The purpose of summary judgment is to determine whether a genuine issue of material fact exists, not to try a question of fact. *Id.* Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Plaintiffs are not required to prove their case at the summary judgment stage. *Id.* at 306. Summary judgment should be granted only when the right of the moving party is clear and free from doubt. *Id.*

In order to state a legally sufficient claim of negligence, a complaint must allege facts establishing the existence of a duty of care owed by the defendants to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Iseberg v. Gross*, 227 Ill. 2d 78, 86-87 (2007). Whether a duty is owed presents a question of law for the court to decide, while breach of duty and proximate cause present questions of fact for the jury to decide. *Id.* at 87.

Defendants first point out that they agree with the appellate court that the contract at issue required defendants to replace the bridge deck exactly as it had existed and did not require them to redesign the existing bridge deck. Because the existing bridge deck did not have a Jersey barrier, replacing the existing bridge deck did not require defendants to consider or add a Jersey barrier. Defendants argue that the appellate court's analysis should have ended at this point, because the question of duty under a contract is a matter of law for the trial court to determine, not a question of fact open to expert opinion. Defendants maintain that the appellate court erred in nonetheless finding that, based upon the standard of care clause in the contract, Ramisch's affidavit created a question of fact concerning whether defendants had a duty to design and recommend a Jersey barrier. Defendants also argue that the appellate court erred in distinguishing

*Ferentchak.*

In response, plaintiff argues that defendants have mischaracterized the majority's use of Ramisch's affidavit. Plaintiff asserts that the appellate court majority determined, through the contract language alone, that defendants owed a standard of care to use the degree of skill and diligence normally employed by professional engineers in designing the bridge deck. It was only after the majority determined defendants' duty that the court considered Ramisch's affidavit to determine whether defendants breached that duty. Plaintiff argues that the appellate court did not err in looking to Ramisch's affidavit to determine whether plaintiff had presented any evidence that defendants breached their duty. Plaintiff also argues that *Ferentchak* is distinguishable from the instant case.

Plaintiff, however, disagrees with the appellate court that the Scope of Services section of the contract did not give rise to a duty to design or recommend a Jersey barrier when replacing the bridge deck. Plaintiff argues that the appellate and trial courts erred in ruling that the term "replacement" in the contract only required defendants to duplicate the existing bridge deck and median. Plaintiff claims that the plain language of the contract provides that defendants were required to design "improvements" to the bridge deck and to prepare all design drawings within the standard of care of similar engineers. Such improvements would include a Jersey barrier. In the alternative, plaintiff contends that, at a minimum, the contract is ambiguous and a question of fact exists concerning whether defendant had a duty to design and recommend a Jersey barrier.

We first address plaintiff's claim that the lower courts erred in finding that the Scope of Services clause in the contract did not give rise to a duty to design or recommend a Jersey barrier, as a finding in plaintiff's favor on this issue would be dispositive. As noted, both the trial and appellate courts agreed that the contract only required defendants to replace the bridge deck and did not require them to improve the deck and add a Jersey barrier.

The relevant provisions of the contract at issue provide as follows. Attachment A, article 2A to the contract sets forth the "Scope of Services." Article 2A states:

> "A. Roadway Design

-8-

Final design and contract plan preparation for the Phase I, Stage A I-94/Grand Avenue interchange *improvements* will be provided. The proposed roadway *improvements* are as described below:

- Redesign Ramp B to two lanes, but maintain one lane at merge to southbound I-94.
- Provide lane drop recovery area on eastbound Grand Avenue east of Ramp B diverge.
- *Improve* Ramp E alignment.
- Proposed *improvements* are to tie to the widening of Grand Avenue, which is to be done by others.

Additional related services to be provided include drainage design, roadway lighting design, and utility adjustments." (Emphases added.)

Article 2B provides:

"B. Structural Design.

Final structural design plans will be provided for deck *replacement* of the existing Grand Avenue bridge over I-94. Final structural design plans will also be prepared for a proposed overhead cantilever sign truss on eastbound Grand Avenue, west of Ramp B." (Emphasis added).

The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). A court will first look to the language of the contract itself to determine the parties' intent. *Id.* at 233. A contract must be construed as a whole, viewing each provision in light of the other provisions. *Id.* The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract. *Id.*

If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. *Gallagher*, 226 Ill. 2d at 233. If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Id.*

Plaintiff argues that in defining the term "replacement," the lower courts viewed the term out of context, ignored other aspects of the contract, and thereby improperly created a definition for "replacement" that does not exist in the contract. Plaintiff contends that, reading the contract in its entirety, the lower courts should have found that defendants were required, pursuant to the contract, to design "improvements" to the bridge deck, improvements that would include safety features such as a Jersey barrier.

We disagree with plaintiff. As the appellate court found, section 2A of the contract uses the word "improvements" in describing the scope of services concerning the roadway design, while section 2B of the contract uses the word "replacement" in describing the scope of services for the structural design. To interpret "replacement" in section 2B to mean "improvement" would render the word "replacement" meaningless. A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. *Fidelity National Title Insurance Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 214 (2007). Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. *Id.* at 215. Because the parties used the term "improvements" in section 2A of the contract, and used the term "replacement" in section 2B of the contract, we presume that the parties chose the word purposefully, and will give effect to that language. It is clear the parties did not intend for the term "replacement" to mean "improvement."

In the alternative, plaintiff argues that, at minimum, the contract was ambiguous concerning whether the term "replacement" required defendants to improve the bridge deck to include a Jersey barrier. In support of her claim that the contract is ambiguous, plaintiff points to the appellate court's statement that there was authority in case law and in dictionary definitions to both support and contradict defendants' interpretation of the word "replacement." 398 Ill. App. 3d at 543.

Although the appellate court did state that case law and dictionary definitions both supported and contradicted defendants' interpretation of the word "replacement" when viewing the word in isolation, the

court looked to the contract as a whole in determining the parties' intent. Viewing the contract as a whole, it was clear that "replacement" did not mean "improvement." Consequently, the fact that the word "replacement" in isolation might be subject to different meanings has no bearing on the use of the word in defendants' contract and does not render the word ambiguous when the meaning of the word is clear in the contract.

Plaintiff also argues that a contract term is ambiguous when it reasonably may be interpreted in more than one way. Plaintiff argues that the term "replacement" may be interpreted in more than one way, noting that although the lower courts ruled that the term did not give rise to a duty on the part of defendants to design or recommend safety improvements, including a Jersey barrier, she interprets the term as requiring defendants to do so. Accordingly, because she interprets the term "replacement" differently than the lower courts, plaintiff maintains that the term is ambiguous.

Plaintiff is correct that where the words in a contract are reasonably susceptible to more than one meaning, they are ambiguous. *Central Illinois Light Co.*, 213 Ill. 2d at 153. A court will find ambiguity if the contract language is " 'obscure in meaning through indefiniteness of expression.' " *Id.* at 153 (quoting *Platt v. Gateway International Motorsports Corp.*, 351 Ill. App. 3d 326, 330 (2004)). However, a contract is not rendered ambiguous merely because the parties disagree on its meaning. *Id.* Here, although plaintiff disagrees with the lower courts concerning the meaning of "replacement" and "improvements" in the contract, the words in the contract are not reasonably susceptible to more than one meaning. Accordingly, we reject plaintiff's claim that the contract is ambiguous.

Having found that the appellate court correctly determined that the word "replacement" in section 2B of the Scope of Services section of the contract did not require defendants to improve the bridge deck to consider or include a Jersey barrier, we next must determine whether the appellate court properly held that the defendants' contract also imposed a professional duty of care on defendants's work, and that the extent of that duty, and whether it was breached, created a factual question subject to expert testimony.

The Standard of Care clause is set forth in article 4A of the contract. Article 4A states:

"The standard of care applicable to ENGINEER's services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services. The ENGINEER will reperform any services not meeting this standard without additional compensation."

The appellate court held that the standard of care set forth in defendants' contract matched the standard of care generally applied to professionals under Illinois law, citing *Advincula v. United Blood Services*, 176 Ill. 2d 1 (1996). 398 Ill. App. 3d at 545. The appellate court noted that *Advincula* explained that in professional negligence cases, the plaintiff bears the burden of proof to establish the standard of care through expert testimony. 398 Ill. App. 3d at 545 (quoting *Advincula*, 176 Ill. 2d at 24). The appellate court therefore considered Ramisch's affidavit in determining the extent of defendants' duty and in concluding that there was a question of fact whether defendants had a duty to design an improved median barrier, despite the contract language that did not require an improved median barrier.

We find the appellate court's reliance on *Advincula* to be misplaced. *Advincula* noted that the professional standard of care is "the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." *Advincula*, 176 Ill. 2d at 23. *Advincula* also observed that, in professional negligence cases, the plaintiff bears the burden to establish the standard of care through expert witness testimony. *Id.* at 24. Expert testimony is necessary to establish both the professional's standard of care and the professional's deviation from the standard of care. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 295 (2000).

As defendants argue, however, *Advincula* and the cases cited therein addressed medical negligence and other types of professional negligence that did not involve contractual duties. Here, defendants' contract set forth the standard of care as "the degree of skill and diligence normally employed by professional engineers or consultants *performing the same or similar services.*" (Emphasis added.) Pursuant to the plain language of the contract, then, the standard of care was limited to the degree of skill and diligence normally employed by professional engineers performing the same or similar services, namely, replacing the bridge deck. As we have found, replacing the

-12-

bridge deck did not include improving the bridge deck or considering or adding a Jersey barrier. Therefore, the appellate court improperly considered expert testimony to expand the duty expressly set forth in defendants' complaint.

Moreover, the appellate court erred in distinguishing the *Ferentchak* decision. Because this case involves a contractual duty, this case is controlled by *Ferentchak* rather than *Advincula*.

In *Ferentchak*, the defendant, Robert Hamilton, a licensed Illinois civil engineer, was hired by a land developer to design and observe the construction of a subdivision's surface water drainage system. *Ferentchak*, 105 Ill. 2d at 476. The contract between Hamilton and the land developer did not require Hamilton to set the foundation grades for each lot. Hamilton designed the system, and the plans were accepted by the land developer and submitted to the Village of Frankfort for approval. The village approved the plans and the subdivision plat was recorded. The plans did not include any specifications concerning the depth or shape of a proposed channel easement for surface water drainage in the subdivision. The land developer sold several lots in the subdivision to a builder, who constructed a single family residence that was sold to plaintiffs. Plaintiffs discovered that water entered their home because the foundation grade level was set too low to prevent that from happening, although the foundation grade level was not in violation of the village's minimum height requirement.

Plaintiffs brought a negligence action against the village, Hamilton, the land developer and the builder. *Id.* at 478. At trial, a civil engineer testified as plaintiff's expert witness that it was Hamilton's professional obligation to incorporate information concerning foundation grade elevations for the lots in the plat. Hamilton testified that the omission was intentional because, *inter alia*, his contract with the land developer did not require him to set foundation levels for the individual lots. A jury found that Hamilton and the village were liable. The appellate court affirmed the judgment against Hamilton, but reversed the judgment against the village. *Ferentchak v. Village of Frankfort*, 121 Ill. App. 3d 599 (1984).

On appeal to this court, Hamilton argued that his responsibility to the plaintiffs was limited to his duty under his contract with the land developer. *Ferentchak*, 105 Ill. 2d at 479. The court noted that the

first issue to be addressed was whether Hamilton had a duty to set the foundation grade levels, which was a question of law. *Id.* at 480. Once a court determines that there is a duty, a jury must decide whether the duty was breached. *Id.* The court concluded that Hamilton owed no legal duty to set the plaintiffs' foundation grade elevation, so that Hamilton's motion for a directed verdict at the close of the plaintiffs' case should have been granted. *Id.* The court held that the contract between Hamilton and the land developer did not create a duty. *Id.*

The court also rejected plaintiffs' argument that Hamilton's duty arose from his professional responsibility as a registered civil engineer. In support of their argument, plaintiffs relied on the testimony of their expert witness, who testified that Hamilton did not exercise the degree of care and skill commonly expected from other civil engineers. The court held that the degree of skill and care required of Hamilton was dependent upon Hamilton's contractual obligation to the land developer. *Id.* at 482. The court stated that " '[t]he scope of that duty, although based upon tort rather than contract, is nevertheless defined by the *** contract' between the engineer and the developer." *Id.* (quoting *Bates & Rogers Construction Corp. v. North Shore Sanitary District*, 92 Ill. App. 3d 90, 97 (1980)).

In so holding, the court noted that expert testimony confirmed its conclusion that Hamilton was not in a position to set the foundation elevation levels for the lots when he developed the plans, regardless of the testimony of plaintiff's expert. *Id.* The court observed that it would be unreasonable to impose an obligation on a civil engineer to set foundation grade levels for individual lots when the engineer does not have adequate information with respect to the type of structures to be erected. *Id.* at 483.

In distinguishing *Ferentchak*, the appellate court looked to the court's statements in the preceding paragraph to conclude that *Ferentchak*'s holding was based on the fact that it would have been impossible for Hamilton to set the foundation levels when the types of structures to be built on the individual lots had yet to be determined. 398 Ill. App. 3d at 547. The appellate court disagreed that the holding was based on the fact that the foundations were not explicitly listed among Hamilton's duties in the contract. *Id.* The appellate court stated that, in this case, defendants were charged with designing precisely the object that plaintiff claimed was defective and had full

knowledge of all relevant aspects of the allegedly defective design. *Id.* at 547-48. The appellate court "read the essence of the holding in *Ferentchak* to be that the engineer there had no knowledge about the defective design and no involvement in creating it. Defendants here had both, and, therefore, *Ferentchak* is distinguishable." *Id.* at 548.

The appellate court further held that, in any event, to the extent *Ferentchak* stood for the proposition that the tort duties imposed on a defendant pursuant to a contract may not exceed the duties contained in the contract, its decision was consistent with *Ferentchak. Id.* The appellate court stated that is holding was based "on the fact that defendants' contract obligated them to employ a professional standard of care in designing a replacement for the bridge deck, and Ramisch's affidavit stands as evidence that defendants breached that standard of care by not considering or designing an improved median barrier, even though the improved median barrier was not explicitly mentioned in the contract." *Id.*

Regardless of the appellate court's view of the "essence" of *Ferentchak*, the actual holding in *Ferentchak* was that the degree of skill and care required of the civil engineer depended on his contractual obligation, and the scope of that duty was defined by the contract. *Ferentchak*, 105 Ill. 2d at 482. While the *Ferentchak* court remarked that Hamilton lacked information and could not be expected to set the foundation grade levels, and that it would be unreasonable to impose such an obligation absent an agreement, those statements were not the basis for the court's holding that Hamilton's duty was defined by his contract.

Pursuant to *Ferentchak*, the scope of defendants' duty is defined by the contract between defendants and WDC. The plain language of that contract required defendants to replace the bridge deck, and in doing so, required defendants to use the degree of skill and diligence normally employed by professional engineers performing the same or similar services. The use of the phrase "same or similar services" limits the scope of defendants' standard of care to replacing the bridge deck. Because the standard of care was expressly limited to defendants' duty to replace the bridge deck, the appellate court erred in considering Ramisch's affidavit to nonetheless raise a question of fact whether defendants' standard of care also required defendants to improve the bridge deck to include a Jersey barrier.

-15-

As the appellate court dissent stated, the majority's holding, that there is a question of fact whether defendants' standard of care included a duty to investigate the need for an improved median barrier, imposes an obligation on defendants that is not provided for in the contract. See 398 Ill. App. 3d at 556-67 (Hutchinson, J., dissenting). The imposition of this duty is contrary to well-settled law, which provides that a court cannot alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented. *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301 (2006). Further, there is a presumption against provisions that easily could have been included in a contract but were not. *Id.* The parties easily could have included a provision in the contract requiring defendants to improve the bridge deck to include a Jersey barrier, but they did not. The appellate court therefore erred in holding that, based upon the standard of care clause in defendants' contract, there was a question of fact whether defendants owed to duty to consider and design a Jersey barrier.

The trial court in this case correctly found that defendants' duty to plaintiff, and the scope of that duty, was circumscribed by the terms of defendants' contract with WDC, which did not require defendants to consider and design an improved median barrier. Because defendants owed no duty to plaintiff to consider and design an improved median barrier, the trial court properly granted summary judgment in favor of defendants. The appellate court, therefore, erred in reversing the judgment of the trial court.

## CONCLUSION

For all of the foregoing reasons, we reverse the decision of the appellate court, affirm the decision of the circuit court, and remand the cause to the circuit court of Lake County for further proceedings consistent with this opinion.

Appellate court judgment reversed;
circuit court judgment affirmed;
cause remanded.